John Treptow Dorsey Whitney for Inlet Fisheries Inc. I'd like to reserve five minutes in rebuttal. All right. I would like to address just two issues with the Court and two very narrow issues. The first issue has to do with the scope of insurance coverage under the Lloyds policy. That is an issue in this case. The second issue deals with the need for uniformity in maritime law. I think it's important to keep in mind that with respect to the insurance that Lloyds issued, Inlet applied for oil spill pollution liability. The application itself said it was for coverage under the Oil Pollution Act of 1990. If you look at the insuring agreement of the policy, you'll see that the scope of coverage is very, very narrow. What was insured was liabilities under Sections 102, 1002, and 1005A of OPA. One particular set of liabilities under CERCLA and any liabilities under any state or political subdivision liability laws that were patterned after either OPA or CERCLA. That was the extent of coverage. What was not covered? What was not covered was any claims arising out of negligence, trespass, nuisance, ultra-hazardous activities, any statutory claims arising out of seven or eight different U.S. statutes dealing with oil pollution liability. So we had a very, very narrow scope under this act or under the policy. You'll notice in the district court's opinion there is basically no discussion of the policy itself. The Court quickly dispatches it and says that it is akin to substantially sumer, are the exact words of the Court, to protection and indemnity insurance. Therefore, it is marine insurance because vessels are involved, vessel operations are involved. It is marine insurance. But the insurance issue in this case is much, much more. The difference between marine vessel pollution insurance and protection and indemnity insurance is very dramatic. Protection and indemnity insurance insures for only negligence. The subject policy insures for strict liability. Protection and indemnity insurance has been able to rely since 1851 on the Limitation of Liability Act. Unless an accident occurs with the privity and knowledge of the shipowner under the 1851 Act, their liability is limited to the value of the vessel. OPA specifically eliminated that protection under the Act. With respect to damages, the P&I policy is able to take advantage of the rule in Robbins Dry Dock. There are no economic losses without personal or physical damage. Under OPA, that very doctrine has been abrogated. So what we have is, in one sense, a policy with very narrow insurance coverage, but very large liabilities. I think it's important to note that this stand-alone vessel pollution insurance was developed by the insurers starting in 1972 after the Clean Water Act. Despite the fact that traditional protection and indemnity insurance provided pollution coverage for those vessels, the insurers stepped out, created both Lloyd's and the Water Quality Insurance Syndicate, which is the largest U.S. insurer, stepped outside, created brand new insurance to cover these statutory liabilities. Well, why did they do that? One reason might be that they wanted the additional premiums. The other might be that the statutory liability that was created was so different than they've been experienced to in the past that they felt that there was a need for new insurance. We needed that insurance. We had protection and indemnity insurance at the time that we applied for Lloyd's policy. Unfortunately for us, our protection and indemnity policy did not provide pollution coverage. So out of a fleet of 13 vessels, we wanted pollution coverage for Open 90 liabilities, and just importantly for state liabilities, for any oil spill that resulted. That's why we got the insurance. Now, I think with respect to the need for uniformity, I don't think that there is any question that the need for uniformity has been a basic principle of Admiralty and Maritime Law since the 1800s. The need for uniformity in Admiralty Law is certainly a cornerstone of the doctrine of duty of utmost good faith. Every court that has adopted that doctrine has discussed, first and foremost, the need for uniformity in Admiralty and Maritime Law. In his concurring opinion in the Wilbur and Bow case, Justice Frankfurter said as follows, quote, It is to be assumed that were the Queen Mary on a world pleasure cruise to New York City, New Orleans and Galveston, a Lloyd's policy covering the voyage would be subjected to the varying insurance laws of New York, Louisiana and Texas. Such an assumption, I am confident, would not prevail were a decision necessary. The business of marine insurance often may be so related to the success of many manifestations of commercial maritime endeavor as to demand application of a uniform rule of law designed to eliminate the vagaries of state law and to keep harmony with the marine insurance laws of other great maritime powers. I wonder what Justice Frankfurter's reaction would have been to the passage of OPA. As the court is aware, in passing the Oil Pollution Act of 1990, Congress specifically enacted what has been called a non-preemption statute. Not only was the United States going to regulate various aspects of oil spill pollution, ranging from civil to criminal penalties to contingency plans to very specific aspects of oil spill pollution, but Congress also knowingly provided that the states could step in and pass laws governing the exact same type of activity. And I think this is truly extraordinary what Congress did. Now, what did the states do in reaction to that opportunity? They jumped into the breach. After the passage of OPA, 20- JUSTICE KENNEDY Mr. Wright, just to interrupt you, what you're driving at is that the doctrine of utmost good faith does not apply because of oil pollution, but it's governed by state law. Is that the bottom line, what you're coming to? MR. WRIGHT Yes, sir. And the reason for that is because there is no need for uniformity because Congress has said we're disregarding uniformity. We're going to regulate it. The states are going to regulate it. And we're going to do that. We're going to do that because past history has indicated that there is, in many situations, not adequate compensation available to clean up spills, to pay for the damages that have resulted from those spills. JUSTICE KENNEDY So what would be the outcome under state law? MR. WRIGHT The outcome under state law would be whether or not we were required to volunteer information regarding matters that were not set forth in the application for insurance. JUSTICE KENNEDY Well, the application called for lost history. MR. WRIGHT Right. And with respect to lost history, the testimony before the district court was, from our perspective, there was an ambiguity on that particular question. The insurance, our insurance broker filled it out. Their affidavit said, with respect to lost history, we thought the application sought the lost history of the four vessels to be insured. Lloyds came back and said, no, no, no. What we were interested in was the lost history of the operator of the vessel. And Judge Sedgwick agreed that that's a reasonable interpretation. JUSTICE KENNEDY But I think there is no information given whatsoever concerning lost history, regardless of how you interpret it. MR. WRIGHT With respect to the four vessels we thought were insured, there had been no lost history. So there was no information on that particular point. JUSTICE KENNEDY But what about the harvester barge? I thought there was history there. MR. WRIGHT Well, the harvester barge, the testimony that was before the district court was, with respect to the harvester barge, there was a minor oil spill by a third-party contractor. They were offloading some fuel by means of a pump and a hose onto shore. The contractor who was in control of the operation spilled oil on the beach. JUSTICE KENNEDY Well, okay. Let me just stop you there. I mean, I'm not going to split hairs over how big or little the oil spill was, but it was at least an incident, correct? MR. WRIGHT Yes or no? It was an incident. JUSTICE KENNEDY Okay. Now, going from there, it seems to me that if we look to State law, in some ways you're trying to get the best of both worlds. Sometimes it's the ship, and other times it's the operator. So if it's the insured vessels or the vessels on which you want insurance, is harvester barge included in those vessels? MR. WRIGHT  JUSTICE KENNEDY Okay. So your argument is, well, even though harvester barge was included and even though there was an incident, as it turns out, somebody else caused the incident. MR. WRIGHT Correct. JUSTICE KENNEDY And therefore, we don't have to report it. MR. WRIGHT The vessel itself did not spill oil. The harvester barge itself did not spill oil. What happened was, in the process of offloading it onshore, the hose leaked, and that was the result of the third-party contractor's actions. Under OPA, that's the... JUSTICE KENNEDY Wasn't the carrier WQ, whatever the acronym is, weren't they asked to, wasn't it submitted as a claim to them? Wasn't harvester barge resulting in a claim to them? MR. WRIGHT No, the harvester barge was much after that, Your Honor. What I think the Court is referring to is an incident involving the Marin One that happened in 2000. Yes, there was an event at that point in time when WQIS was the insurer. Marin One was not one of the vessels that was covered under the Lloyds policy. JUSTICE KENNEDY So you say there was no claim for harvester barge? MR. WRIGHT There was, but that was at the time that Lloyds had already raised its reservation of rights. So was there a claim? JUSTICE KENNEDY I don't mean later. I had in my mind a recollection that there had been a claim submitted to WQIS, whoever it is, regarding harvester barge prior to the submission of the application. Okay. MR. WRIGHT That all had to do with the Marin One. And then while the parties were bickering about whether or not there was coverage for the QP's bill, there was the harvester barge bill the later in the spring. And at that point in time, ENA was in bankruptcy. Was there a claim made? I don't think a claim was officially made, but certainly the incident occurred then. But the point that I was trying to make at the end of the day with respect to Alaska state law, one, there's no duty to volunteer information. An insurer is in the best position under Alaska law to know what information it needs. It asks the questions, and the insurer is required to truthfully answer them. And if the insurer does not truthfully answer them and completely answers them, that can void the policy. But under Alaska law, unless you ask or you intentionally misrepresent that which you were representing, there's no basis for voiding the policy. Let me just go back to ask, you know, the way we could look at this case is under, you know, the absolute duty to disclose, you know, as talked about in the Wilburn boat, or we could say it's state law, or we could say it doesn't matter and we could look at it under either one. Yes, my question is whether under our own cases, for example, the Signet case where we basically have said with respect to marine insurance policy you're bound to disclose every fact within your knowledge, we do have that. And I guess your point is you don't view this as a marine insurance policy. No, that's not correct, Your Honor. Okay. With respect to both the Polaris case and the Montford case, this Court said that both cases involve California law, and California law specifically regulates marine insurance. The Court said basically under either the duty of utmost faith under Federal law or under California law, you have the same duty. Correct. The Court did acknowledge that it was established, well-established law. Well-established and entrenched in our Federal law. No, no. And I think that's a big difference, because I think this Court has never taken the opportunity that says that it is an entrenched doctrine. And as Judge Sedgwick pointed out in his opinion, and this is an excerpt of Record 207, 207, 205, the majority rule is that the doctrine of ubermaephidian marine insurance contracts, long ago recognized by the Supreme Court, is established Federal amnesty law. Only the First and Fifth Circuits have departed from this holding, and so doing, the First and Fifth Circuits appear to have misread Wilburn boat. Well, whether or not the First and Fifth Circuits had misread Wilburn boat, I would suggest to the Court that there is not a, as this Court has said, a well-established Federal maritime rule on this particular subject. And as such, the next step in the process, as this Court pointed out in the Bohemia Inc. case, is you take a look. Then, if there's no Federal statute, no well-established judge-created admiralty rule, you look at whether or not there is a need for uniformity. Prior to Wilburn boat, was there much question about whether there was such a doctrine? I mean, it may be that Wilburn boat raises a question, but well-established strikes me that established in history isn't hard to make out. I thought your argument was based on the proposition that Wilburn boat changed things. Well, I think it did change things because basically what you have the Court looking at, from my view of the case, is that it gave lip service to the fact that there was, you know, well, in interpreting marine insurance contracts, there were well-established principles in that case dealing with marine warranties. But in certain circumstances where those rule did not specifically address the warranties in question, that's when you begin looking at state law. And, you know, perhaps that was a result-oriented opinion, but it's one that I think has been followed and much discussed ever since. Well, prior to Wilburn boat, was the doctrine, the name of which I won't try to pronounce, do you dispute that was, in fact, an established doctrine in Federal maritime law or admiralty law? It was with respect to the insurance that was issued during that period of time. Well, it was the principle was established, correct, in terms of the duty. I mean, it's been established now for a couple hundred years. Correct. And the United States Supreme Court followed English law in that regard. Correct. So to not keep following that stream, you either have to somehow un-entrench it or, I guess, that's what I'm trying to understand, if your argument is really by virtue of the nature of this what you try to distinguish as a new kind of insurance. That's exactly what I'm trying to do, Your Honor, is the fact that the type of insurance that we were talking about did not come into existence until Congress created statutory liabilities starting in the 1970s. In 1990, Congress, wisdom or lack of, came out with liabilities that are very specific, and this insurance was designed, developed to cover those specific liabilities. Well, let me just ask you, you know, as a matter of logic, if you had this obligation to disclose when there might be negligence, because that would suggest some potential sloppiness on the part of either the operator or the ship, you know, contractor or whatever, and then the obligation is changed to strict liability so it doesn't even matter, it's just a question of things can happen, why would that call for a change in the analysis? I think that the change in the analysis comes from Congress's intent in passing OPA and to ensure that full compensation is available to victims of oil spill. That's the difference. Where previously protection indemnity and the rest were for the benefit of the ship owner, now Congress said with respect to those benefits, we're going to take away full and complete compensation, and that's what's driving this, and anything basically that gets in the way of that, Congress just swept aside. I mean, they did not rule, the Limitation Act is still in effect, but not with respect to OPA, and I think that's the point that I'm trying to make. It seems to me Congress was trying to protect the victims and the downstream people affected by that, but that doesn't really change the relationship between the, in the marine insurance, between the insurance company and the ship owner. It might change the ship owner's liability, but why does it change the insurance relationship? Well, because. I mean, if anything else, it would seem to me to underscore the necessity for fuller and complete disclosure, not the other. Well, I think the fact that the insurance companies elected not to go with protection indemnity insurance, not to basically amend those policies to include those coverage, to go to a brand new, a brand new set of insurance, I think that's a recognition that it is a brand new day, and oh, by the way, we're going to charge you for that new coverage, even though you may have coverage under the protection indemnity policy. Is your argument that the intent of Congress to protect the downstream people from oil, the damage from oil spill is inconsistent with the rule that makes it easy for the insurer to back out of the policy under the utmost good faith doctrine? Is that your point? Absolutely, Your Honor, because the information that was requested in the policy was provided. What the doctrine of utmost good faith does, it provides the insurer, after the fact, to come in and say, well, you didn't tell us about X, Y, and Z. Therefore, there's no coverage. And I don't think that that's the one. I don't think that is consistent with Congress's policy. And also, it's inconsistent with the way that the insurance business is run in every other facet of the insurance business except marine insurance. Okay. We'll hear from the marine insurers, but I'm going to give you some rebuttal  Thank you, Your Honor. Good morning, Your Honors. My name is Chris Nickel, and I'm here for the marine insurers, Lloyd's. And if it pleases the Court, I'd also like to introduce my partner, Larry Altenbrun, who's sitting at the table. Your Honors, I had a whole bunch of notes prepared for how I might address this argument, but it seems that the issues are narrowing from what they initially appeared in the briefs to a couple of questions. The first question appears to be not necessarily whether the doctrine of ibera mefida is well established in the maritime law. It appears that it's conceded that it is. The question appears to be instead whether or not that policy of ibera mefida, utmost good faith, ought to be applied in the case of a vessel pollution insurance policy such as this. Let me touch on a couple of things here. First of all, Open 90 doesn't merely create a form of strict liability. It also creates a new method for limiting liability. And the ability of a shipowner to limit liability under Open 90 depends upon a whole series of other things, such as, for example, have they operated consistently with applicable regulations? Did they give proper notice of an oil spill when it occurred? There are a lot of ways in which Open 90 extends existing law and establishes the right of claimants under existing law. For example, under 1002 of Open 90, third parties with suffering property damage can sue the vessel owner as a result of the oil spill and all those sorts of things. This policy, if you look at the policy, and it's in various places throughout the record, but the one that comes to mind is ER 0359 in pages following. This policy covers all of the Open 90 liabilities, circle liabilities, and Federal Water Pollution Control Act liabilities, which are themselves, you know, quite potentially extensive. The policy goes further, however, and it also, at Endorsement 3, covers liability, for example, for personal injury or wrongful death of third parties who are engaged in cleaning up an oil spill and that sort of thing. This policy ensures the liabilities of the vessel owner that he incurs as owner or operator of the insured vessel, just exactly the same way a P&I policy does, as this Court recognized in the Bohemia case. The only difference between this policy and a P&I policy is that it does somewhat narrow the focus of the coverage to matters relating to pollution and to pollution response and cleanup. Now, as to whether or not the doctrine applies, I guess the question ought to be whether vessel pollution insurance is marine insurance. And it doesn't sound like there was much of an argument made about that, but the whole question about whether something is marine in nature or not was recently addressed by this Court in Century Select and by the Supreme Court in the Kirby case. And it simply has to do with whether or not matters of maritime commerce and the use of vessels are involved. If they are, then it's marine. If they're not, or primarily not, then it's not. This obviously is primarily marine. This insurance policy falls within the admiralty jurisdiction, and as a result, maritime law applies. Maritime law doesn't apply. Kennedy. Do you draw a distinction between marine and wet marine? Yeah. That's a statutory distinction, Your Honor. In the Port of Portland case, a case involving a dispute with the WQIS in the Port of Portland under the WQIS version of the vessel pollution insurance policy, an issue arose as to whether or not the Oregon law regarding attorney's fees applied when the Port of Portland won that coverage case. And that came down to a question of whether or not wet marine, whether the policy was one of wet marine insurance or general marine insurance. The Ninth Circuit found that it was a policy of general marine insurance, which I guess proves my point here that it is marine insurance, but found that it wasn't wet marine as defined under the Oregon statute. Now, the Oregon statute is similar to the Alaska statute. However, there is one important difference between that case and this, and that's the footnote 4 in the Port of Portland case points out that the Port of Portland in that case only wanted certain specific liabilities covered. And so it only took a certain specific aspect of that insurance and not the broader insurance against liabilities that were also available under the policy. That is a big difference between that case and this. This case offers, in this case, the full range of the liabilities available under the vessel pollution insurance policy offered by Lloyd's Underwriters was offered and accepted, with one exception, that being that Inlet didn't ask for an insurance guarantee to support the issuance of a certificate of financial  Now, if you look at Alaska's statute, which draws a distinction between marine and wet marine insurance. Well, the way the Alaska statute would work out is the subsection. If we decide, if this Court were to decide that the doctrine of verbatim equity is not well established and, therefore, doesn't govern in the face of a contrary state law, then you'd look to state law. And Alaska state law has the statute that does not apply to wet marine insurance. Now, given the distinction in that footnote between the Port of Portland case, the coverage that was given in the Port of Portland case and the coverage that was given in this case, we submit that even under the Port of Portland analysis, this policy would qualify as so-called wet marine. And, therefore, that statute wouldn't apply. It would leave us with a void in Alaska law, and we would see that there's no conflicting law at all. We'd be back to maritime law. So what is it in the footnote that you say results in the Alaska statute not applying? Well, in the Port of Portland case, in footnote 4, if you permit me to find it. I've got it here. It says, WQAS also argues that its policy is a modified version of the standard protection and indemnity policy in that it covers one area of shipowner's liability pollution hazards from oil that has been traditionally covered by P&I contracts. Here's the important part. We disagree that the policy is a pure P&I policy, as Section 731.194 seems to require. Traditional P&I policies cover oil pollution damage to third persons. WQAS's policy contains that coverage, but the Port did not purchase it. WQAS's coverage is for the new and unique statutory liability created by the FWPCA. Open 90, Section 1002, provides for liability to third persons. Our policy covers liability to third persons, not just the old, you know, remediate-the-oil-spill type of liability. This is a liability policy. And our policy goes further in Endorsement 3, extending the potential coverage to harm that's suffered by third persons in the course of an oil spill cleanup. So let me just get back to your position then. Well, let's start with the Uber-May-Fide doctrine. We've laid some footprints, but we haven't taken a definitive position. Do you agree with that in the Ninth Circuit? Well, I think the Ninth Circuit has said now repeatedly in the Cigna case and in the Montford case and in recently even the Century Select that the doctrine of utmost good faith, the rule of absolute disclosure, is established in Federal maritime law. I don't really think the question is open. Prior to Wilburn Boat, the Supreme Court had twice adopted, applied the utmost good faith doctrine, first in McClanahan in the 1820s and in the later part of the 1800s in a case that's slipping my mind. But we've cited it. Well, counsel says we need uniformity. But, of course, we have un-uniformity already with the Fifth Circuit, correct, out there. And then we have some other circuits such as the Eleventh and others that would seem to be more consistent with the Ninth Circuit already. The Eleventh and the Second Circuit are squarely, squarely support the idea that Uber-May-Fide is firmly established in the judicial. So is it only the Fifth Circuit that would be an outlier at this point? Yes, only the on-CQ case of the Fifth Circuit. And even that Fifth Circuit case limited itself to the facts of that case. There's a reference in the case that says we're not saying that the doctrine wouldn't apply in some other case or in some other way. But in this case, it doesn't. Okay. So now let's just move from that. If we were to leave the Federal maritime principle and we were to go to Alaska law, your position is that Alaska law doesn't actually apply, there's a hole in it, and it brings you back to Federal law? Our position, in answer to Judge Schwartz's question, is that this policy qualifies as wet marine insurance under the Alaska statute. The Alaska Attorney General has issued an opinion to that effect already, in an unrelated matter, of course. And there are key distinctions between this policy and the one that was before this Court in the Port of Portland case. So let's just stop there. If it doesn't, if it's, if this is wet marine insurance, but the Alaska statute does not apply to wet marine insurance, is that correct? That's right. Therefore, you would say that there's no State law applicable, or is that correct, no State statute? What I would say is that the Alaska legislature intended for maritime law, Federal maritime law, to apply to the question of what needs to be represented to a marine insurer. That puzzles me a little, because I'm not sure, I understand we're grasping here as to what the intent is, but why is it the State would presume that in the absence of an Alaska statute, Federal maritime law would apply? Well, by the time, well, of course, Alaska adopted a statute that was generated by a uniform committee, right? So the National Association of Insurance Insurers or whatever. And the fact that there is a body of Federal maritime law that governs things like is something that isn't recent in its development. I mean, we often have to assume that legislatures are aware of the laws that exist at the time that they act. In a general proposition, it's unusual that the State speaks first, and in the absence of the State, you turn to Federal. And Gober and Boat suggests, still the first question is, is there a well-established Federal law? Is there a doctrine that suggests it's up to the State to decide whether it wants to step forward, and if it doesn't step forward, then Federal maritime law applies? That seems sort of backwards. Well, I'm not suggesting that that's how it happened. I mean, I think an enlightened approach would be that what's the purpose of establishing a law on the point within your State if it is only going to fall when it is in conflict with an existing judicial rule in the Federal advocacy? So it may be that the insurance commissioners, whoever drafted the statute, recognize this field had already been claimed to by Federal law? That's exactly right. In fact, that's the thesis that the article that's been cited by both sides takes, the Popham article. You review that, you'll see that there's a great and extensive discussion on this whole issue, and it provides some more background on the point. But, again, my point merely is, you know, we look at this Alaska statute, and it looks to us like even if we said there was no rule, there may be. All right. Well, that's how I was going to get to that. Even if there's no rule, and if you're wrong that it doesn't apply, that this isn't wet marine insurance, and then we got to the statute. Now let's get to the statute. Okay. So the statute reads in the disjunctive. Is that correct? Alternative means of preventing recovery. Yes. Fraudulent material or wouldn't have issued because of knowledge of what was going on. Yes. So under your theory, if we were to go under the Alaska statute, how would this be analyzed? Well, the proof in the case is still without serious contest that the underwriters and a reasonable underwriter, if it had been provided with the true facts that were not disclosed, would either not have issued the policy or would not have issued it with the same terms or at the same premium rate if the true facts had been made known. And so under the statute, Alaska statute 21.42.110, if it were to apply, we would still be back at the same point that we were at initially, which is that because these key facts were not disclosed, the prior loss history involving the Marron One, the prior loss history involving the Harvester Barge, the prior cancellation of the insurance policy by WQIS for noncompliance with requirements for surveys and repairs and the prior port condition of the vessels, if those facts had been disclosed, these insurers have specifically testified they wouldn't have covered it. The other insurer, WQIS, issued a declaration saying that they wouldn't have covered it. In fact, WQIS had canceled the policy for less. So we know beyond question that the policy would not have been issued had the true facts been disclosed. So as we read the Alaska law, the results would be the same as under Rivera-Mangfide. And I think the point that my colleague makes, Mr. Treptow makes, is that, well, that's as may be, but there's this case out there in Alaska that says an insured has no duty to just volunteer this information. You have to ask for it. And then we get down to the question. If we're down to the statute applying, we're down then to what did the question ask and what was disclosed. The question asked for loss. It says, well, we have it in the record. Loss history. Loss history of what? It was a one line. Correct. And it didn't distinguish between the vessel's loss history or the insured's loss history. Pollution. It says pollution. Pollution loss history, yes. Okay. So we don't know if that's the vessel or the owner. No. Actually, we know that it's both. Okay. And how do we know that? Okay. And we know that it's both because it doesn't distinguish between either. There are two. There are two. Boy, that's a lawyer's argument. Well, there's a recent case, Your Honor, called, I think it's Halifax. It's out of the District of Massachusetts. And in that case, the insured took the position that the question asked, asked only about the owning company's loss record and not the loss record of the vessel. It turns out the vessel that was being insured was had recently sunk to the bottom and had rested on the bottom and had its bottom replaced. And the owner took the position, well, the question wasn't clear. We thought you were asking about our personal loss record, and our personal loss record is impeccable. Yeah, they knew about the vessel. They knew about the fact that it sunk and that it needed its bottom replaced, but they didn't disclose that, and they argued, look, you didn't ask that. And the court in that case took the position on summary judgment that the question is asking for both because both are relevant and both are material. And under the doctrine of iberme fide, there can be no question but that whether asked or not asked, the information has to be supplied. And there can be no question but that it's material. There's no question that it was known by the insured. So in this case, you know, the insured had possession of information that was clearly material and that they did not provide. Answering the question. Even if we took, even if we, Inlet says it's the vessel, correct? Inlet says it's the vessel. So if it were the vessel, then were they required to disclose this little oil spill that he mentions? If we took the very, very narrow view, yes, even that little oil spill. But that little oil spill wasn't as little as they say. We're not going to get into how big it was. Right. Because that's not, they don't ask if you had a little or a big spill. It's just a pollution loss history. And what was, and he says, well, it's really not the vessel. It's a third-party responsibility. So it's not really the vessel. They reported it immediately to their WQIS. They reported it the same day. WQIS, they later made a claim against WQIS to recover the money that was spent to clean that spill up. Let me ask you, is the policy in the record? Yes. Can we look at the policy and determine from the face of it whether it's wet marine or marine? Well, the policy doesn't specifically say whether it's wet marine. We interpret it so as to determine whether it's one or the other. Oh, yes. I think so, Your Honor, especially with the guidance from the Popham case, from the Portland case. You'll clearly see the distinction between the types of liabilities that are covered under our policy and those that were covered under the old version of the policy in the Port of Portland case. It's wet marine. It's wet marine insurance. Yes. In the sense that, look, these legislatures across the country established a past bunch of statutes for marine and transportation insurance, a very, very big broad area that actually includes things like railroad, you know, rail carriage and aircraft carriage and so-called inland marine. And the distinction that they sought to draw was between that which is truly wet, i.e., involving vessels and over water transportation, and that which is non-marine transportation. So wet marine is not. It's what we consider maritime. Yes. It's what we consider maritime. Federal in terms of federal admiralty. Yes. And in conclusion, Your Honor, I see I'm running out of time. The doctrine of iberimate fide needs to be upheld, because at this point in time, particularly with policies like this, insurers need to know that they are under a duty to disclose the facts that they privately hold. This insurance business will be impossible to conduct on any kind of an economic or efficient basis for the benefit of all concerned if underwriters have to initiate extensive insurance coverage investigations prior to placement. Thank you. You may have a minute for rebuttal, since we took a bit of your time and questions. Very quickly, Your Honor. It is the First and Fifth Circuit that have held that the iberimate fide is not well entrenched doctrine, and Judge Settle discussed both of those opinions. I would suggest that the rule is not well settled, and that is the point that this Bohemia made, that the rule had to be, quote, well established. As far as whether or not this is wet marine, the Alaska statute, AS 2142.010, and the statute construed by the court in the Portland case are identical. We borrow a lot of our law from Oregon. Those two statutes are identical. It is not marine insurance. That's exactly what the court says. Accordingly, WQS policy is not wet marine, but rather general marine. And with respect to the pollution loss history, if you look at the application in the record, which is ER 43 through 45, it says, quote, pollution loss history none. The little spill that we were talking about was never reported to the insurance company, and if you go back and look at the record, so there was no pollution loss history. We did not submit a claim on that. So your view is if there was no claim submitted, there's no pollution loss? Pollution loss history, exactly. We didn't suffer pollution loss as a result of that minor spill by the harvester barge. Well, I guess if we got down to that issue, then we would have to say there was a factual issue. Correct. Thank you. Keith just argued Lloyds v. Inlet Fisheries is submitted. Thank you for your arguments. Very interesting case. And finally, we have the case of Fisher v. State Farm.
judges: McKeown, Clifton, Schwarzer